STATE OF MINNESOTA *ex rel.* JAMES N. MARR *vs.* SAMUEL S. LUTHER, County Auditor.

Argued Dec. 8, 1893.    Affirmed Jan. 5, 1894.

No. 8512.

**Taxation of lands of the St. Paul & Duluth Railroad.**

Sp. Laws 1865, ch. 8, entitled "An act in relation to the taxation of lands granted to the Lake Superior and Mississippi Railroad Company," passed March 3d, repealed the proviso attached to section 1 of the prior act, (Sp. Laws 1865, ch. 2,) passed February 23d, and exempts the granted lands from taxation in the ordinary way as long as they continue to be owned by the company.

**Constitutional amendment validated tax on gross earnings.**

Assuming, without deciding, that laws passed subsequent to the adoption of the state constitution, providing for the payment of a percentage on the gross earnings of a railroad company in lieu of all other taxes on its railroad and granted lands, were invalid when passed, they were validated by the constitutional amendment of 1871, (article 4, § 32a.)

Appeal by relator, James N. Marr, from an order of the District Court of Aitkin County, *G. W. Holland*, J., made August 16, 1893, denying his application for a peremptory writ of mandamus.

Relator was on June 15, 1893, and long had been a citizen freeholder and tax payer in Aitkin County. The St. Paul and Duluth Railroad Company owned Section 15, T. 45, R. 27, and other lands in that county, deriving title to some of the land under the Act of Congress approved May 5, 1864, (13 U. S. Stat. p. 64,) and title to other pieces under a swamp land grant from this State. Sp. Laws 1861, ch. 1. These lands were not assessed or taxed in that county. The relator obtained from the District Court an alternative writ of mandamus directed to Samuel S. Luther, County Auditor, commanding him to place said lands upon the assessment rolls and tax lists and extend against them a just proportion of the taxes of the county, or show cause before the Court July 31, 1892, why he did not do so. He made return that the lands were not subject to taxation and set forth by title the several statutes of the Territory and State of Minnesota and of the Federal Congress creating the Lake Superior and Mississippi Railroad Company and granting lands to it. He also set forth the proceedings under which the St. Paul and Duluth Railroad Company succeeded to that franchise and property and claimed that under the Constitution, Art. 4, § 32a, and the statutes regarding the taxation of this railroad, Sp. Laws 1865, ch. 8, he was not authorized to enter the lands upon the assessment rolls or tax lists of his county. The Court refused to issue the peremptory writ and the relator appeals.

*H. W. Childs*, Attorney General, and *A. Y. Merrill*, for appellant.
*Bunn & Hadley* and *James D. Armstrong*, for respondent.

MITCHELL, J.    The question presented by this appeal is whether the "granted" lands of the St. Paul & Duluth (formerly Lake Superior & Mississippi) Railway Company are subject to be listed and taxed

as other lands in the state. These lands were acquired in part from the state under the "swamp-land grant" to aid in the construction of the road, (Sp. Laws 1861, ch. 1,) and in part under the congressional grant of May 5, 1864, (13 U. S. Stat. p. 64,) to the state, in trust for the same purpose, and the act of the legislature (Sp. Laws 1865, ch. 2) transferring the grant to the railway company.

It is conceded that the railway company became entitled to the particular lands sought to be taxed more than five years before the commencement of these proceedings.

1. The first contention of the relator is that the lands are thus taxable by the terms of the proviso attached to section 1, Sp. Laws 1865, ch. 2, which is "that said railroad lands shall be taxed as other lands in the state in five years after the said company shall become entitled to said lands."

On the other hand, the respondent claims that this proviso was repealed by Sp. Laws 1865, ch. 8.

In order to determine which of these contentions is correct, it becomes necessary to place the two acts side by side, compare their provisions, and ascertain the purpose of each.

Chapter 2 was passed February 23d, and chapter 8, March 3d, eight days later. The first was primarily a "land-grant act," as indicated by its title,—"An act to execute the trust created by the act of congress," etc., although it also provided for a system or mode of taxation of the lands and other property of the railway company. The second act was exclusively a tax law, the title being "An act in relation to the taxation of lands granted" to the railroad company.

The system of taxation provided for in the first act was that the company should each year, "after said road is completed and in operation," pay into the state treasury three per cent. of the gross earnings of the road, which should be in lieu and in full of all taxation and assessment upon the road, its appurtenances and appendages, and all other property, real, personal, and mixed, including the lands hereby and heretofore granted to said company; provided, however, that such granted lands should be subject, like lands of individuals, to be taxed as fast as the same are sold or conveyed or are leased by the company, or stumpage sold or contracted to be sold thereon. Had the act stopped here, then, clearly, the lands would have remained exempt from taxation in the ordinary way as long as

the company continued to own them, and had not contracted to sell them, or leased them, or sold stumpage. The proviso referred to was attached, limiting this exemption to five years from the time the company became entitled to the lands.

This method of taxation, for some reason, evidently proved unsatisfactory, for eight days afterwards the legislature, under suspension of the rules, and on the same day that the bill was introduced, passed chapter 8, revising the whole system of the taxation of the property and lands of the company. The system of taxation provided by this act was that, whenever any of the granted lands should be contracted to be sold, conveyed, or leased, the same should be placed upon the tax list for taxation as other real estate, but that, in enforcing the collection of taxes thereon, only the improvements and interest of the purchaser or lessee should be sold, and that the title or interest of the company, or of any trustee or mortgagee, should not be affected. The effect of this, by necessary implication, was that until sold, contracted to be sold, or leased, the lands were to be entirely exempt from taxation in the ordinary way.

The act further provided that the company should, during the first three years after thirty miles of its road were completed and in operation, pay into the state treasury one per cent., and during the next seven years two per cent., and thereafter three per cent., of the gross earnings of the road, and "that the payment of such per centum annually as aforesaid shall be and is in full of all taxation and assessment whatever." A repealing clause, usually found at the end of a statute, is found in the body of this act, which provides that "the provisions of the several acts [there were some prior to 1865] in relation to the taxation of the lands of said company, so far as the mode of taxing such lands conflict with the provisions of this act, shall be and they are repealed." The extent and scope of this repealing clause is the chief point of difference between the parties. Does it repeal the "five-year" limitation in the act of February 23d? is the question.

Counsel for the relator invokes two rules of construction: *First,* that repeals by implication are not favored; *Second,* that statutes granting exemption from taxation are to be construed strictly in favor of the state. Even conceding the applicability of these rules to the case, it seems to us perfectly apparent that, as respects taxation, the second act was intended as a revision of or substitute for the

first, and to prescribe the only rule on the subject.  The second act covers all the ground covered by the first, making various changes, some in favor of the state, and others in favor of the company, although, as usual in those days, mostly the latter.  And it is also perfectly clear to us that under the second act, even if the repealing clause was absent, the legislature intended that the granted lands should remain exempt from ordinary taxation as long as they continued to belong exclusively to the company.

But neither of the rules are applicable.  The case is one of express, and not of implied, repeal.  The second act contains an express repeal, and the only question is what or how much it repeals.

Neither is the question whether there is a grant of immunity from taxation, but whether a commuted system or mode of taxation has been provided.  It is a common error, in construing statutes like the present, to assume that because the commuted tax is fixed with reference to, and is wholly derived from, the gross earnings of the road, therefore the lands are exempted from taxation altogether.  The percentage of the gross earnings is paid as taxes on both the railroad and the granted lands, and, although derived wholly from the former, is a commutation tax alike on both.

Passing now to the construction of the language of the repealing clause in the second act, we think it is perfectly plain that the phrase "mode of taxing such lands," cannot refer to the mere machinery for taxation, such as listing, assessing, collecting, etc., for neither act furnishes any mode of doing these things.  The phrase was evidently used in the broader sense of "method" or "system."  In this sense the first act provided the commuted system for five years, and ordinary taxation thereafter; the second act, a graduated commuted system, as long as the company continued to own the lands, without limitation as to time.  The repugnancy or inconsistency between the proviso referred to and the second act is apparent, for the effect of reading the proviso into the second act would be to change and overrule, to that extent, the plain meaning of the act, standing alone.

It is also urged that the words, "shall be and is in full of all taxation and assessment whatever," found in the second act, relate only to "railroad property," and not to granted lands.  As already suggested, the preceding provisions of the act, of themselves, provide,

by necessary implication, that granted lands shall not be subject to ordinary taxation until contracted to be sold or leased, and then only to the extent of the interest of the purchaser or lessee. But, whatever the words quoted might mean in a law dealing exclusively with the taxation of railroad property, there can be no doubt of their meaning here in this act, entitled an act in relation to the taxation of the lands granted, whose whole subject-matter and scope has relation to the taxation of such lands. The decisions of this court cited by counsel on this point lend him no support; for in those cases the property held liable to ordinary taxation was neither granted lands nor property devoted to railroad uses; and in every one of those cases the statute construed extended, in accordance with the uniform legislative policy, the commuted system of taxation to granted lands as well as to railroad property. *County of Ramsey* v. *Chicago, M. & St. P. Ry. Co.*, 33 Minn. 537, (24 N. W. 313;) *County of Todd* v. *St. Paul, M. & M. Ry. Co.*, 38 Minn. 163, (36 N. W. 109;) *State* v. *Northern Pac. R. Co.*, 39 Minn. 25, (38 N. W. 635.)

Our conclusion is that under the provisions of Sp. Laws 1865, ch. 8, these lands are not subject to taxation in the ordinary way in which other lands in the state are taxable.

In the light of experience, it is probably very unfortunate that the legislature, in dealing with the various land-grant railway companies, did not impose some reasonable limitation as to the time during which this immunity of the granted lands from ordinary taxation should continue. But, if the state made injudicious contracts, the mistake is remediless now.

2. But counsel for relator contend that the provisions of both these acts are unconstitutional so far as they exempt the granted lands from taxation like other lands in the state. Their claim is that these provisions are in conflict with the Constitution, Art. 9, §§ 1, 3, the first of which provides that "all taxes to be raised in this state shall be as nearly equal as may be; and all property on which taxes are to be levied shall have a cash valuation and be equalized and uniform throughout the state;" and the other, that "laws shall be passed taxing all moneys, credits * * * and also all real and personal property according to its true value in money."

Counsel concedes that it is settled by the case of *First Div. St.*

*P. & P. R. Co.* v. *Parcher*, 14 Minn. 297, (Gil. 224,) that, where the legislature of the territory.had contracted for a commuted system and an exemption from ordinary taxation, it was competent for the legislature of the state, after the adoption of the constitution, to retake and hold this right as a franchise without merger, and vest it in any other railway company; but they contend that it was not competent for the legislature to provide anew for any such commuted system of taxation. There is nothing in the suggestion that such laws may be held valid as to the taxation of property devoted to railroad purposes, but void as to the taxation of the granted lands.

The provisions of the laws as to taxation must be all valid, or all void, and for two reasons: First, the percentage of the gross earnings of the road is a tax on both the road and the lands, and not the road alone; and, second, the vice, if there be one, in the commuted system of taxation, would apply to the one class of property as well as the other. If there is anything in counsel's point, both classes of property must, under the constitution, be taxed according to its true value in money. The question is one that affects the whole tax system of the state. If all such laws are invalid, the consequences would be most serious, affecting the taxation, not only of railroads, but also of mining, insurance, telegraph, telephone, and express companies, and the like, most if not all of which have been taxed for years on the basis of their receipts or earnings. We do not care to pass upon or consider a question of such great importance until it is necessary, and we do not think that the question arises in this case. Conceding, without deciding, that tax laws such as we are now considering were invalid when enacted, still we are of opinion that the effect of the constitutional amendment of 1871 (article 4, § 32a) was to validate all such laws relating to the taxation of railway property. To a proper understanding of the meaning and scope of this amendment, it is necessary to consider it in the light of the previous legislative policy of the state on the subject. The system of providing for the payment of a percentage of the gross earnings of the road in lieu of all other taxes on "railroad property" and on the lands granted to aid in its construction, while owned by the company, was inaugurated by the territorial

legislatures, and was universally in vogue at the date of the adoption of the constitution.

And after that date the state legislatures invariably assumed that they continued to possess the power to adopt this system of commuted taxation when granting lands to aid in the construction of a railroad, whether such lands were the absolute property of the state, or were held by it in trust for that purpose under an act of congress. This was the practice, not only as to old grants made before the adoption of the constitution, but also as to new grants, both state and congressional, made after that date.

Among the congressional grants made subsequently to the adoption of the constitution, to aid in the construction of railroads in this state, are the act of March 3, 1865, (13 U. S. Stat. p. 526,) increasing the grant of 1857 to ten sections per mile; the act of May 5, 1864, (13 U. S. Stat. p. 64,) making a grant to aid in the construction of a road from St. Paul to Lake Superior; the act of May 12, 1864, (13 U. S. Stat. ch. 84, § 7, p. 74,) granting four additional sections per mile to aid the construction of a road from St. Paul and St. Anthony to the southern line of the state; the act of July 4, 1866, (14 U. S. Stat. p. 87,) making a grant to aid in the construction of what is called the Hastings & Dakota Railroad; the act of July 2, 1864, (13 U. S. Stat. p. 365,) making a grant directly to the Northern Pacific Company to aid in the construction of its road.

Among the grants made by the state itself for like purposes were that of March 6, 1863, (Sp. Laws 1863, ch. 4,) of swamp lands to the St. Paul & Pacific Company to aid the construction of a road from St. Paul to Winona; the act of February 16, 1865, (Sp. Laws 1865, ch. 1,) granting swamp lands to aid the construction of the Southern Minnesota Railroad; the act of March 8, 1861, (Sp. Laws 1861, ch. 1, § 18,) making a grant of swamp lands (to which the lands here in controversy in part belong) to aid in the construction of the road from St. Paul to Lake Superior.

And in every instance the legislature, in making or transferring the grant to the railway company, provided for the exemption of the lands from ordinary taxation while owned by the company, in consideration of its paying to the state, annually, a certain percentage of the gross earnings of the road. They provided for the same system of taxation for the Northern Pacific Company, which

received its grant directly from congress. Sp. Laws 1870, ch. 65, § 1.

In brief, the legislature assumed that when making a grant of lands to aid the building of a railway, or in executing the trus† where lands had been granted to the state by congress for the same purpose, (and which, while thus held by the state, either as proprietor or in trust, were, of course, not subject to taxation,) it had the power, in the furtherance of the object for which the grant was made, to exempt such lands from ordinary taxation, and to provide for commuted taxation of both the railroad and the granted lands.

There is not in the history of the state a single grant of lands to aid the building of a railway, where this system of commuted taxation has not been adopted, and we have not found an instance, prior to the adoption of the constitutional amendment of 1871, Const. Art. 4, § 32a, where a commuted system of taxation was provided that did not apply to a land grant as well as to the railroad property. This amounted to a legislative construction of the constitution, which of itself would be entitled to great weight.

In this situation of things, the people adopted a constitutional amendment, Const. Art. 4, § 32a, ordaining that "any law providing for the repeal or amendment of any law or laws heretofore or hereafter enacted which provides that any railroad company now existing in this state, or operating its road therein, or which may be hereafter organized shall in lieu of all other taxes and assessments upon their real estate, roads, rolling stock, and other personal property, at and during the time and periods therein specified, pay into the treasury of this state a certain percentage therein mentioned of the gross earnings of such railroad companies now existing or hereafter organized shall, before the same shall take effect and be in force, be submitted to a vote of the people of the state, and be adopted and ratified by a majority of the electors voting at the election at which the same shall be submitted to them."

This language must have been selected and this amendment adopted with reference to the existing legislation and the general legislative policy to which we have referred; and, read and construed in that light, it amounts to a clear recognition of the validity of existing laws providing for this commuted system of taxation of railroad property and lands, and of legislative power to

enact such laws for the future. If it did not refer to this, there was nothing to which it could refer. It is, by necessary implication, a validation of past legislation of that kind, and a grant of power to enact it in the future. It is pretty clearly indicated in *City of St. Paul* v. *St. Paul & S. C. R. Co.*, 23 Minn. 469, and *County of Stevens* v. *St. Paul, M. & M. Ry. Co.*, 36 Minn. 472, (31 N. W. 942;) that this was the view then entertained by the court. Within a year and a half after the adoption of this constitutional amendment, the legislature passed a general law (1878 G. S. ch. 11, §§ 128, 129) providing for this system of taxation for any railway company that would accept the provisions of the act; and this system has been universally in vogue down to date, without question as to its validity, until raised in this case.

We think the acts are constitutional.

Order affirmed.

---

## ON APPLICATION FOR REARGUMENT.

### Jan. 25, 1894.

MITCHELL, J. The application for a reargument is denied.

But inasmuch as an *obiter* remark in the opinion might be understood to mean that acts providing for a commuted system of taxing railroad property and granted lands constitute contracts between the state and the railway companies which cannot be repealed or amended, it is proper to say that no such question was before the court, and that the remark referred to was not intended to express or intimate any opinion on that point.

(Opinions published 57 N. W. Rep. 464.)